The **PEOPLE** of the State of Colorado,
Plaintiff–Appellant,

v.

Norman **ADKINS**, Defendant–Appellee.

No. 05SA85.

Supreme Court of Colorado,
En Banc.

June 13, 2005.

Mark D. Hurlbert, District Attorney, Fifth Judicial District, Rachel Olguin–Fresquez, Chief Deputy District Attorney, Georgetown, for Plaintiff–Appellant.

David S. Kaplan, Colorado State Public Defender, Dale W. McPhetres, Deputy State Public Defender, Silverthorne, for Defendant–Appellant.

Justice MARTINEZ delivered the Opinion of the Court.

The People bring this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), C.R.S. (2004), seeking reversal of the trial court's ruling suppressing evidence obtained during the custodial interrogation of defendant Norman Adkins. The trial court's decision to suppress the contested statements was based on its finding that the interviewing officers violated the defendant's Fifth Amendment rights by failing to cease questioning upon Adkins' request for an attorney. Because the record supports the trial court's conclusion that Adkins' state-ments must be suppressed, we affirm the ruling of the trial court.

## I. Facts and Procedure

The prosecution appeals an order of the Clear Creek County District Court granting Adkins' motion to suppress statements he made during a custodial interrogation by Detective Ferranti of the Clear Creek County Sheriff's Office. Following a suppression hearing in which Detective Ferranti testified and a videotape of the interrogation was introduced into evidence, the trial court granted Adkins' motion to suppress. The evidence produced at the suppression hearing and entered into the record detail the following:

In March 2004, Adkins was investigated and charged with one count of Sexual Assault on a Child by One in a Position of Trust and one count of Sexual Assault on a Child. Following his arrest, Adkins was placed in a jail jumpsuit, his ankles were cuffed and he was seated in a holding room to await questioning. Shortly thereafter, at approximately 8:26 a.m., Detective Ferranti from the Clear Creek County Sheriff's Office entered the room to proceed with an interrogation.

Detective Ferranti informed Adkins that he was investigating a complaint for sexual assault on a child. Detective Ferranti explained that he could not answer or speak to Adkins until he gave him his *Miranda* advisement and Adkins signed the advisement form. Adkins then asked "Who am I supposed to have molested here?" Detective Ferranti then explained "Let me fill this form out, if you give me permission to talk to you, I'll give you the lowdown on why I got you here."

Detective Ferranti sat across the desk from Adkins and began to fill out the advisement form. When Detective Ferranti wrote in "Sexual Assault to a Child/Position of Trust," Adkins stated "This is really bad."

As Detective Ferranti read the advisement, he pointed to the corresponding section on the advisement form and asked Adkins to initial the blank space next to each line of the advisement as he read them. When Detective Ferranti read the line that

begins: "You have the right to speak with an attorney and have him present with you during questioning . . . ," Adkins interrupted "Why don't I have one now."[1] Detective Ferranti paused, did not respond, and then continued the advisement—"If you cannot afford an attorney, the court will appoint one for you for free of charge"—while directing Adkins to initial the blank space next to the corresponding line of the advisement.

After Detective Ferranti finished reading the advisement, Adkins again states, "How come I don't have a lawyer right now."[2] Detective Ferranti responded "You haven't been advised by a judge yet. You'll probably do that this morning . . . around ten or eleven." Detective Ferranti then instructed Adkins to write "yes" next to the line that reads "Do you understand these rights?" and to sign and date the form waiving his rights. After Adkins signed the waiver, Detective Ferranti began the interrogation.

Prior to trial, Adkins filed a motion to suppress any and all statements he made following the advisement by Detective Ferranti. Adkins argued two bases for suppressing the statements made during the interrogation. First, Adkins argued that he requested counsel during his advisement and Detective Ferranti was required to stop questioning until an attorney was present. Second, Adkins claimed his waiver of the right to counsel was invalid because Adkins requested counsel during the advisement but was "misadvised" by Detective Ferranti that he had no right to counsel until he was advised by a judge. As such, Adkins contended that the waiver of his *Miranda* rights was not made knowingly or intelligently.

Having heard the testimony of Detective Ferranti and reviewing the videotape of the advisement and interrogation, the trial court entered an oral ruling and concluded that based upon the totality of the circumstances there were two independent reasons for suppressing Adkins' statements during the interrogation. First, the trial court held that Adkins' statements made during his advisement were unambiguous requests for an attorney. As a result of the requests, Detective Ferranti was required to cease questioning until Adkins had an attorney and, because he continued questioning, all statements made by Adkins during the interrogation must be suppressed. Second, the trial court alternatively found that Adkins' statements during the interrogation should be suppressed because he did not knowingly and intelligently waive his right to counsel. The trial court found that because Detective Ferranti misled Adkins concerning whether an attorney could be present for the interrogation, the evidence did not support a finding that Adkins understood his right to have counsel present or the consequences of abandoning that right. Accordingly, the trial court granted Adkins' motion to suppress and the prosecution filed this interlocutory appeal.

## II. Analysis

When reviewing suppression cases, "[t]he question before us is a mixed issue of law and fact." *People v. Romero*, 953 P.2d 550, 555 (Colo.1998). We, like the trial court, review the totality of circumstances in reaching the ultimate legal conclusion in suppression order cases. *Id.* With regard to the factual issues, "the trial court must assess the reliability of the evidence and credibility

1. Based upon our review of the videotape, it is difficult to discern precisely what Adkins is saying. As the trial court pointed out in its verbal order, it is difficult to hear exactly what Adkins said during this part of the advisement because Adkins' voice is muddled on the videotape. Here, Adkins is facing down at the desk and in the direction of Detective Ferranti but away from the video camera. As such, the trial judge noted that Adkins might have said "how come I don't have an attorney now."

2. Adkins' voice again sounds muddled. It sounds as if Adkins may have said "well" prior to "how come I don't have a lawyer right now." In

addition, Adkins appears to say "in here" or "then" following "how come I don't have a lawyer right now." Thus, it appears Adkins' complete statement would read "Well, how come I don't have a lawyer right now then" or "Well, how come I don't have a lawyer right now in here." In any event, because we are in no better position than the trial court to evaluate the audio portion of the videotape and don't believe the difference is dispositive in this case, we defer to the trial court's finding that incorporated the audibly clear statement "How come I don't have a lawyer right now."

of witnesses while making an independent assessment of whether the suspect sufficiently clearly invoked the right to counsel based upon the totality of the circumstances." *Id.* (internal quotations omitted). We defer to the trial court's findings of historical fact when there exists sufficient evidence in the record to support them. *Id.* The trial court's legal conclusion, however, is subject to our de novo review. *Id.*

■ Based upon our review of the trial court's order, the trial court record, and the videotape of the advisement and interrogation, we find that the factual findings are supported by the record and we agree with the trial court's conclusion that Adkins' statements made during the interrogation following the advisement must be suppressed. Adkins made an unambiguous and unequivocal request for counsel during interrogation and all questioning should have ceased until he was provided the assistance of counsel. Given that the interrogation continued, all of Adkins' statements to Detective Ferranti following his advisement and invocation of the right to counsel must be suppressed. Because we affirm the trial court's order to suppress based upon Adkins' request for counsel, we find it unnecessary to address the trial court's second finding that Adkins did not knowingly and voluntarily waive the right to counsel.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court examined the scope of protection against self-incrimination embodied in the Fifth Amendment to the United States Constitution. The Court established procedural safeguards to ensure the protection of Fifth Amendment rights and permit courts to assess whether statements made during custodial interrogation may be admitted as evidence against an accused in future judicial proceedings. 384 U.S. at 444–45, 86 S.Ct. 1602. The Court held that the Fifth Amendment requires law enforcement, prior to any custodial interrogation of an accused, to advise that person that he or she has a right to remain silent; that any statements made may be used as evidence against the accused; that the accused has a right to consult with an attorney prior to police inter-

rogation and to have an attorney present during any interrogation; and that if the accused cannot afford to retain an attorney, an attorney will be furnished without cost. *Id.* The Supreme Court also indicated that with respect to the right to counsel, once an accused requests representation by counsel, all police-initiated interrogation must cease until the accused has consulted with an attorney. 384 U.S. at 474, 86 S.Ct. 1602.

■ Subsequently, in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court clarified that a defendant who invokes the Fifth Amendment right to counsel during custodial interrogation may not be subjected to further interrogation until counsel is made available to him, unless the defendant later initiates communications. The Court found that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* at 485, 101 S.Ct. 1880. The accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880. A request for counsel may come "at *any* stage of the process," including during the *Miranda* advisement, and requires that questioning cease until counsel has been provided. *Smith v. Illinois*, 469 U.S. 91, 98 n. 6, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (citing *Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602).

In this case, we review whether the accused invoked his right to have counsel present at questioning.

■ The question of whether an accused invoked the right to counsel is an objective inquiry. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Romero*, 953 P.2d at 554. To be a sufficient request that mandates law enforcement cease questioning until an attorney is present, a request for counsel must be unambiguous and unequivocal. *Davis*, 512 U.S. at 461–62, 114 S.Ct. 2350;

*Romero,* 953 P.2d at 558. To determine if a request for counsel was made, the trial court must consider whether the accused's statement "can reasonably be construed to be an *expression of a desire* for the assistance of an attorney *in dealing with custodial interrogation by the police.*" *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis added). If the desire for counsel is presented "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," no ambiguity or equivocation exists, and all questioning must cease until the person can confer with counsel or the accused voluntarily reinitiates conversation. *Davis,* 512 U.S. at 461–62, 114 S.Ct. 2350; *Romero,* 953 P.2d at 558. In other words, a court reviewing an alleged request for counsel must determine "whether in the context of question and answer, the [accused's] responses reasonably could be construed by a police officer to mean that the suspect wanted a lawyer." *Romero,* 953 P.2d at 556.

Our prior decisions addressing what constitutes a sufficiently clear statement invoking the right to counsel, as opposed to an ambiguous statement, are consistent with the United States Supreme Court's test and prior United States Supreme Court precedent. *See id.* at 554. We have said that a statement sufficiently reflects a desire for counsel when it "put[s] the officers on notice that the defendant intend[s] to exercise his right to counsel and his right against self-incrimination." *People v. Fish,* 660 P.2d 505, 509 (Colo.1983). In contrast, an ambiguous communication is the "type of conduct, giving rise to opposing inferences." *People v. Benjamin,* 732 P.2d 1167, 1171 (Colo.1987).

■■■ In determining whether an accused sufficiently invoked the right to counsel, we are mindful that many suspects, given their individual characteristics and the circumstances of the interrogation, may not "request an attorney 'in the most sophisticated or legally proper form.'" *Romero,* 953 P.2d at 554 (quoting *People v. Harris,* 191 Colo. 234, 237, 552 P.2d 10, 12 (1976)). Because suspects "may not be legally sophisticated or paragons of clarity in their use of language,"

*id.* at 554–55, the Supreme Court in *Davis* observed that a suspect need not "speak with the discrimination of an Oxford don." 512 U.S. at 459, 114 S.Ct. 2350; *see also Romero,* 953 P.2d at 556. As such, "when reviewing an accused's statement for alleged ambiguity, courts must give broad, rather than narrow, interpretation to a defendant's request for counsel." *People v. Kleber,* 859 P.2d 1361, 1363 (Colo.1993) (citing *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)). Given this standard, we have held that a broad range of statements under a variety of circumstances sufficiently make clear an accused's desire to be assisted by counsel. *See Romero,* 953 P.2d at 552–53 ("Cause I, ya know, I'm not gunna lie man, ya know, I mean I should wait, and *I should talk to a lawyer* and this and that and ya know ...."); *Kleber,* 859 P.2d at 1362 (during custodial interrogation, defendant remarked that he wished to discuss a prior polygraph test with an attorney); *Fish,* 660 P.2d at 507 (defendant asked the officers "if he needed an attorney"); *People v. Cerezo,* 635 P.2d 197, 198 (Colo.1981) ("I think I better have a lawyer."); *People v. Traubert,* 199 Colo. 322, 325, 608 P.2d 342, 344 (Colo. 1980) ("I think I need to see a lawyer."); *Harris,* 191 Colo. at 235, 552 P.2d at 11 ("When can I get a lawyer.").

We now turn to the facts of this case and the proceedings below to determine if Adkins invoked the right to counsel.

First, we determine that the trial court correctly looked to the totality of circumstances to make its findings of fact and conclusion of law that Adkins unambiguously invoked the right to counsel. We next agree with the trial court that, based on the totality of circumstances, Adkins' statements sufficiently clearly expressed a desire for the assistance of counsel during the interrogation. As such, we reject the prosecution's contention on appeal that Adkins' statements are ambiguous and equivocal because they are subject to two equally logical inferences—one of which is not a request for counsel. We therefore conclude that Adkins unambiguously invoked the right to counsel.

The record on review demonstrates that the trial court considered several circum-

stances surrounding the advisement and interrogation to determine that Detective Ferranti had sufficient reason to believe that Adkins had invoked his right to counsel. The trial court looked to the words spoken by Detective Ferranti; the words used by Adkins in referring to counsel; Detective Ferranti's response to Adkins' reference to counsel; Adkins' repeated questioning about having an attorney "now"; the demeanor and tone of Detective Ferranti; the point at which Adkins invoked counsel; and who was present during the interrogation. *See Romero*, 953 P.2d at 555–56 (court reviewed similar factors to determine if a request for counsel was unambiguous); *see also People v. Trujillo*, 938 P.2d 117, 124 (Colo.1997) (employing similar factors in determining the issue of custodial interrogation).

Like the trial court, because the request for counsel came during the *Miranda* advisement, we find the timing of Adkins' reference to counsel and Detective Ferranti's response (or non-response) particularly persuasive in concluding that Adkins made an unambiguous request for counsel. Adkins' first reference to counsel came immediately after Detective Ferranti informed Adkins that he had the right to counsel. Adkins interrupted Detective Ferranti and stated "why don't I have one now." Detective Ferranti paused, but instead of responding to Adkins, Detective Ferranti pressed ahead to read the remainder of the advisement. Significantly, Adkins' remark about an attorney came as soon as Detective Ferranti informed Adkins of his right to counsel.

There is no indication from Detective Ferranti's testimony or the videotape of the advisement that Detective Ferranti did not hear or understand Adkins. In fact, the trial court characterized Detective Ferranti as "ignoring" Adkins. If a defendant is going to invoke the right to counsel, we cannot imagine a time more obvious than during the advisement, or in this case, as soon as the defendant was informed of the right. Moreover, Adkins expressed his specific desire for counsel at that moment—"now"—rather than asking about acquiring an attorney in the future. Adkins specifically, asked why *he* did not have counsel *now*. By referring to counsel and inquiring why he did not have an attorney present, Adkins sufficiently demonstrated his desire for the assistance of counsel during the interrogation. Given that the remark was made at such a critical and early stage of his interaction with Detective Ferranti, it appears clear that Adkins put Detective Ferranti on notice that the he "intended to exercise his right to counsel and his right against self-incrimination." *See Fish*, 660 P.2d at 509.

We also find it compelling that Adkins, for a second time, stated "how come I don't have a lawyer right now." Having waited for Detective Ferranti to read the remainder of the advisement and given the opportunity to repeat himself, Adkins added to his first inquiry for counsel and made clear he wanted to have an attorney "right now" during the interrogation. Although by itself Adkins' first reference to counsel was sufficient to invoke the right to counsel, his second reference clarifies his desire to have an attorney present and in the interrogation room with him.[3]

The prosecution nevertheless contends that Adkins' statements were ambiguous and equivocal because one can derive two separate inferences from them. The prosecution acknowledges that the statements do give rise to the inference that Adkins was invoking the right to counsel. The prosecution contends, however, that a second, equally plausible inference can be made that Adkins was simply trying to "find out his options on when he would get a court appointed counsel." We disagree that the second inference

---

**3.** We disagree with the prosecution's argument that because Adkins' request for counsel might have been phrased as a question to Detective Ferranti, it was not an affirmative demand for counsel, but instead an equivocal request for counsel that is insufficient to invoke the right. "When invoking the right to counsel during custodial interrogation, a person may *demand* an attorney, a person may *ask for* an attorney, or a person may make *some statement* which can 'reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Romero*, 953 P.2d at 557 (quoting *Davis*, 512 U.S. at 459, 114 S.Ct. 2350). Here, despite that Adkins may have framed his assertions for counsel differently, in the form of questions, Adkins expressed a desire for the assistance of counsel during the interrogation.

alleged by the prosecution is supported by the record or is an objectively reasonable inference based on the circumstances surrounding Adkins' statements.

First, as we discuss above, the timing of Adkins' first reference to counsel came immediately after Detective Ferranti informed Adkins that he had the right to counsel. Adkins interrupted Detective Ferranti and stated "why don't I have one now." Instead of responding to Adkins, Detective Ferranti ignored Adkins and read the remainder of the advisement. There is nothing in this first reference to counsel that suggests Adkins was looking to determine his "options" for obtaining appointed counsel.

The prosecution, however, insists that after Adkins again referred to having counsel "right now," Detective Ferranti's response is sufficient evidence to show that a second objectively reasonable inference can be made from Adkins' statements. That is, because Detective Ferranti responded to Adkins as if Adkins asked when he might be appointed counsel or be advised by a judge, it is objectively reasonable that one could infer Adkins was inquiring about his options for counsel. We disagree given the actions and demeanor of Detective Ferranti throughout the advisement.

During the suppression hearing Detective Ferranti testified but did not offer any testimony about his impression or subjective interpretation of Adkins' statements. As such, the record as it relates to the content of the advisement is found solely in the videotape. Based on its review of the videotape, the trial court found that not only did Detective Fer-

ranti first ignore Adkins, but when he responded to Adkins' second reference to counsel, Detective Ferranti's answer "misstated" Adkins' legal rights with regard to an attorney. Detective Ferranti was quickly trying to move through the advisement and get Adkins to initial the written waiver and at no point actually inquired if Adkins understood his rights or if he was willing to speak with him. The trial court acknowledged that there is no reason to believe Detective Ferranti was trying to deceive Adkins during the advisement, but it is clear that Detective Ferranti was more focused on getting through the advisement than listening to Adkins or trying to make sure he understood his rights.

Given his demeanor in trying to quickly move through the advisement and ignoring Adkins' first reference to counsel, we find it unpersuasive that when Detective Ferranti finally responded to Adkins, his response demonstrates that Adkins' statements could have been construed by a reasonable police officer under the same circumstances as anything other than a request for an attorney.[4]

The prosecution also attempts to bolster its argument in support of a second inference by analogizing this case to *People v. Benjamin*, 732 P.2d 1167 (Colo.1987). Similar to this court's finding in *Benjamin* of a second "equally logical inference" that the defendant was "considering his options" about getting counsel appointed rather than strictly making a request for counsel, the prosecution contends that an inference can also be made in this case that Adkins was considering his options about getting counsel appointed rath-

4. In support of its argument, we note that the prosecution's presentation and construction of the facts before the trial court is somewhat contrary to how the argument has been presented to this court. During the suppression hearing, when the trial court pressed the prosecution for an interpretation of the dialogue between Adkins and Ferranti during the advisement, the prosecution argued that Detective Ferranti was "nonresponsive" to Adkins. Specifically, despite Adkins' questions why he did not have an attorney "right now," Ferranti explained that he would be advised by a judge in a few hours. The prosecution asserted that Detective Ferranti's response "[did not] answer the question whatsoever, it simply tells [Adkins] when he'll be advised." Here on appeal, however, the prosecution attempts to place significance on Detective Ferranti's response as evidence that Adkins was trying to find out his options on when he would get a court appointed counsel. That is, the prosecution contends that Detective Ferranti was merely explaining to Adkins the legal procedure for getting an appointed attorney "in response to [Adkins'] question." We find it unpersuasive and unconvincing on the part of the prosecution to argue on appeal that Detective Ferranti's response supports a logical and equally persuasive inference from Adkins' questions, but, when posed with the question before the trial court, the prosecution reasoned that Detective Ferranti's answer was wholly unresponsive to Adkins' questions.

er than solely making a request for counsel. The facts of *Benjamin,* however, are unquestionably distinguishable from the facts in this case.

In *Benjamin,* a defendant signed a form to request a determination whether he was eligible for the assistance of a public defender without cost to him and was later interviewed by an investigator from the public defenders' office. 732 P.2d at 1168. Subsequently, the defendant was approached by a detective while in the Denver Police Department Detention Center. *Id.* The detective gave the defendant a *Miranda* advisement, asked the defendant if he was willing to waive those rights, and had the defendant sign a written waiver. *Id.* at 1169. The detective then proceeded to interrogate the defendant. *Id.*

The defendant later moved to suppress all statements made during the interrogation by the detective as violative of his Fifth Amendment right against self-incrimination. *Id.* The defendant argued that by signing the form requesting his eligibility for the appointment of a public defender, he made a sufficient request for counsel that should have ceased all further interrogation by law enforcement unless defendant was accompanied by an attorney. *Id.*

We rejected defendant's argument and found that evidence of filling out a request for public defender eligibility form and meeting with an investigator employed by the public defenders' office was, at best, an ambiguous request for counsel. *Id.* at 1171–72. We noted that the actions of the defendant gave rise to "opposing inferences" because although one could infer the defendant was requesting counsel, one could also make an "equally logical inference" that the "defendant was *considering his options* and simply desired to know whether, if he chose to be represented by an attorney, he would be able to have such representation without cost to himself." *Id.* at 1171 (emphasis added). Because the request was ambiguous and the defendant voluntarily waived his right to counsel, we found his statements during the interrogation were admissible at trial.

The facts here are inapposite. First, unlike *Benjamin,* Adkins referred to counsel during the *Miranda* advisement. In this case it becomes substantially more reasonable for a police officer to recognize a defendant's expression of desire for an attorney when it occurs during the advisement as opposed to some other time. Moreover, the disputed reference to counsel in *Benjamin* did not come at any point during the advisement or the interrogation, but instead preceded both and occurred on another occasion altogether.

Second, the disputed reference to counsel in *Benjamin* was based on the *actions* of defendant filling out a request for eligibility form and later meeting with an investigator from the public defenders' office; whereas here Adkins communicated his invocation of counsel *verbally.* Again, because Adkins *verbally* directed his request for counsel to the interrogating officer, the circumstances of this case are distinguishable from *Benjamin* in that the reference to counsel in this case is considerably more recognizable to a police officer as an invocation of the right to counsel.

Last, the very notion of a defendant filling out a request for eligibility form and speaking with an investigator can clearly be attributed to a purpose other than invoking counsel. The defendant filling out the eligibility form in *Benjamin* gives credence, in and of itself, to the inference that the defendant sought to determine if he might be eligible for an attorney at no cost and be appointed an attorney at a future date. As such, there is clear support for this court's finding that the defendant might have been "considering his options". Here, however, Adkins' statement "how come I don't have an attorney right now" cannot be clearly attributed to any purpose other than to ask why there is no attorney with him for the interrogation *now.*

Given the timing of the reference to counsel, Adkins' specific indication of having counsel "now", emphasizing the desire for counsel "right now" in the interrogation room when he repeated himself to Detective Ferranti, and Detective Ferranti's demeanor throughout the advisement, we agree with the trial court and find that a reasonable police officer under the circumstances would

understand the statement to be a request for an attorney to be present during interrogation. As such, we conclude that Adkins unambiguously and unequivocally invoked his Fifth Amendment right to counsel.

## III. Conclusion

The record in this case supports the trial court's decision to suppress Adkins' statements because his Fifth Amendment rights were violated when Detective Ferranti failed to cease questioning upon Adkins' unambiguous invocation of the right counsel. Accordingly, we affirm the ruling of the trial court.

Justice COATS dissents, and Justice KOURLIS joins in the dissent.

Justice COATS, dissenting.

Today the majority suppresses an uncoerced confession in a prosecution for sexual assault on a child, often the determinative piece of evidence in such cases, by applying a "bright-line" rule of exclusion, in support of what was no more than a "prophylactic" rule in the first place, in an overly mechanical way that would no longer be sanctioned even by the court that created both rules. Because I believe the majority has simply missed the proper analysis, and because I believe this hostile approach to the use of confessions as a legitimate investigative tool strikes an improper balance between protecting the constitutional rights of defendants and protecting future victims of such crimes, I respectfully dissent.

There is no suggestion that the defendant's inculpatory statements were coerced or in any way involuntary. The majority does not even find that the defendant's waiver of his *Miranda* rights was involuntary or unintelligent. It simply holds that when the defendant demanded to know why he did not already have an attorney, that statement alone barred any further advisement of his rights and rendered invalid his subsequent waiver of his right to have counsel present during questioning. Because of the substantial and deleterious impact of such a rigid rule of exclusion on the public interest, even when properly applied, the United States Supreme Court has made clear that it is

triggered only by a request for counsel that is not only unambiguous, but specifically seeks legal representation during questioning by the police, rather than merely legal representation in defense of the charges generally.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court extended the defendant's Fifth Amendment privilege against self-incrimination beyond the courthouse, including a right to have counsel present during custodial interrogation in further protection of the privilege. To prevent the police from "badgering" a suspect to waive this so-called Fifth Amendment right to counsel, the Court also imposed a "bright-line" rule, barring further police-initiated contact outside the presence of counsel, once an unambiguous request for counsel has been made. *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). A similar "bright-line" rule was held to bar police-initiated contact outside the presence of counsel after invocation, following formal charging, of an accused's right to counsel guaranteed by the Sixth Amendment. *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). In limiting the scope of this latter "bright-line" rule to the offense with which the defendant had been charged, *cf. Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (holding that *Edwards* bright-line rule applies even to unrelated offenses), the Court drew a sharp distinction between invocation of the Fifth Amendment right to counsel and invocation of the Sixth Amendment right to counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *see also People v. Vigoa*, 841 P.2d 311 (Colo. 1992).

Unlike the Sixth Amendment right, the Fifth Amendment right is not limited in application to a specific offense that has already been formally charged because its purpose is to permit a suspect to deal with police only through counsel, rather than to protect a defendant at all critical confrontations with the government during a particular prosecution. In this sense, the different purpose for the Fifth Amendment right makes it broader

than the Sixth Amendment right, but at the same time, since the two rights offer protections against different dangers, an attempt to invoke one does not necessarily indicate a desire to invoke the other. Regardless of the subjective intent of a suspect, however, *McNeil* makes clear that "[t]he rule of [*Edwards* ] applies only when the suspect 'ha[s] *expressed* ' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*," *McNeil*, 501 U.S. at 178, 111 S.Ct. 2204 (quoting from *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880), and that "requires at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *Id.* (emphasis in original).

In addition to holding that the assertion of the Sixth Amendment right does not in fact imply an assertion of the *Miranda* "Fifth Amendment" right, the *McNeil* Court went on to consider whether it should nevertheless adopt such a rule as a matter of sound policy. It rejected such an extension as unwise, primarily for two reasons. *McNeil*, 501 U.S. at 180, 111 S.Ct. 2204. First, it reasoned that any such rule would have only insignificant advantages because a suspect who does not wish to communicate with the police except through an attorney can simply tell them that when they actually give him the *Miranda* warnings. *Id.; see also Vigoa*, 841 P.2d at 317 ("All the defendant had to do to protect his Fifth Amendment privilege against self-incrimination during custodial interrogation ... was to tell [the detective] after being advised of his *Miranda* rights, that he wanted to confer with counsel prior to making any statement."). In the absence of any prior request by him to talk to them, there is no reason to think the suspect would feel "badgered" by a police request to interview him, which was the danger the *Edwards* rule was created to protect against. Second, such an expansion of the rule would, however, seriously impede effective law enforcement and run counter to the very policy decision originally made in *Miranda*, to require warnings and a right to counsel during custodial interrogation rather than bar the use of even voluntary confessions.

Although even an invocation of the Sixth Amendment right would prevent further police-initiated contact concerning the charges with regard to which the defendant had invoked the right, because no charges had yet been filed in this case, the defendant did not yet have a Sixth Amendment right to invoke. *See People v. Anderson*, 842 P.2d 621 (Colo. 1992); *People v. Vigoa*, 841 P.2d 311 (1992). The question before the court in this case should therefore have been limited to whether the defendant's question, "How come I don't have an attorney right now," could reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police, invoking his Fifth Amendment right to counsel, as distinguished from merely a desire for legal representation in the case.

Rather than requiring an unambiguous invocation of the only right of counsel to which the defendant was entitled at that point, the majority falls back upon language derived from *Michigan v. Jackson*, to the effect that courts must give broad, rather than narrow, interpretation to a defendant's request for counsel. *See* maj. op. at 796. In *McNeil*, however, the author of *Jackson* laments, and simultaneously concedes, that the majority rejects "the common sense evaluation of the nature of an accused's request for counsel that we expressly endorsed in *Jackson*." *McNeil*, 501 U.S. at 185, 111 S.Ct. 2204 (Stevens, J., dissenting). In view of *McNeil*, the Supreme Court's subsequent requirement of an unambiguous request for counsel to invoke the *Edwards* bright-line rule, *see Davis*, 512 U.S. at 459, 114 S.Ct. 2350, cannot be understood to mean anything other than an unambiguous request for the assistance of counsel during interaction with the police.

The majority holding virtually eliminates any requirement for an expression by the defendant of his desire not to deal with the police without counsel being present by presuming as much whenever the defendant makes reference to counsel during an advisement by the police. This very case, however, demonstrates why such a presumption is unwarranted. The defendant's question is clearly not an expression of any desire to have counsel intercede in conversations with

the police but rather a statement of indignation that he has not already been provided counsel to represent him in the case. To the extent that such a remark could be taken as an unambiguous request for counsel at all, it can only be reasonably understood as a claim of right to counsel at a time before the defendant was ever faced with police interrogation.

The defendant was clearly anxious to talk to the police in order to learn about the charges against him, and upon completion of the advisement, without the slightest coaxing or "badgering," he waived his right to have counsel present and spoke with them. Nothing in the scenario suggested that he ever wished to remain silent until counsel could be present. By indicating that the defendant would not be appointed counsel until he had been advised by the judge, the advising officer neither misled him nor denied him his right, but merely answered his question truthfully. *Miranda* did not purport to require police stations to maintain on-call defense attorneys to advise arrestees on demand. *Davis*, 512 U.S. at 460, 114 S.Ct. 2350. As in virtually every other venue in the country, had the defendant requested the presence of counsel during custodial interrogation, he would undoubtedly have simply been returned to his cell until he was advised and counsel could be provided. The defendant was constitutionally entitled merely to remain silent or have counsel present during questioning; not to have counsel appointed any sooner.

Without hesitation, the defendant signed a form indicating his understanding of his right to waive his *Miranda* rights and his willingness to answer questions at that time. Because it found a violation of the *Edwards* bright-line rule, the majority did not review the district court's finding that the defendant's waiver of his right to have counsel present was unintelligent. In the absence of evidence of illiteracy, mental or language problems, or illegibility of the form, however, I would find the mere failure to read the entire form out loud to the defendant insufficient to support a finding that the waiver was ineffective.

Because I believe the analysis of the majority does not reflect the current state of the law, as reflected in the jurisprudence of either this court or the United States Supreme Court; and because I believe this approach to the use of confessions burdens the public good without correspondingly protecting the constitutional rights of criminal defendants, I would reverse the district court's order of suppression.

I therefore respectfully dissent.

I am authorized to state that Justice KOURLIS joins in this dissent.